**State of LOUISIANA, et al.**

v.

**BRASELMAN CORPORATION, et al.**

**No. Civ.A.96–0862 CW.**

United States District Court, E.D. Louisiana.

Feb. 10, 1999.

Richard Gladstein, Aimee Jimenez, Michael Donnellan, Environmental Enforcement Section, U.S. Dept. of Justice, Washington, DC, James L. Turner, U.S. Environmental Protection Agency, Dallas, TX, for plaintiff U.S.

Louis E. Buatt, Louisiana Department of Environmental Quality, Office of Legal Affairs & Enforcement, Baton Rouge, LA, for plaintiff.

John Y. Pearce, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Braselman Corporation, Shirley B Braselman, defendants.

Manning Gasch, Jr., Hunton & Williams, Richmond, VA, Benjamin Richard Slater, Jr., Anne Elise Brown, Slater Law Firm, New Orleans, LA, Joseph M. Spivey, III, Lisa S. Spickler, Christopher R. Graham, Hunton & Williams, Richmond, VA, James L. Bradford, III, Seale, Daigle & Ross, Covington, LA, for Alabama Great Southern Railroad Company, defendant.

American Creosote Works, Inc. by J. Douglas Nesom, Pensacola, FL, for defendant American Creosote Works, Inc.

Michael A. Chernekoff, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, William L. Schuette, Jr., Jones, Walker, Waechter, Poitevent,

Carrere & Denegre, LLP, Baton Rouge, LA, Charles H. Tisdale, King & Spalding, Atlanta, GA, for Union Camp Corporation, third-party plaintiff.

Robert Allan Vosbein, Glen Marion Pilie, Deborah Bila Rouen, Adams & Reese, New Orleans, LA, for Kerr–McGee Chemical Corporation, third-party defendant.

### ORDER AND REASONS

LEMMON, District Judge.

**IT IS HEREBY ORDERED** that Alabama Great Southern Railroad Company's motion for summary judgment on grounds that the action is time-barred is **DENIED** (Document # 89). The cross-motion for summary judgment of the United States of America and the State of Louisiana is **GRANTED.** Document # 116.

**IT IS FURTHER ORDERED** that the motion for summary judgment of the United States of America and the State of Louisiana (Document # 83) is **GRANTED IN PART AND DENIED IN PART:** the summary judgment motion is **GRANTED** on the issue of the Alabama Great Southern Railroad Company's liability for response costs as a responsible person, and that portion of the motion for summary judgment seeking joint and several liability is **DENIED.** Alabama Great Southern Railroad Company's cross-motion for summary judgment on the issue of liability is **DENIED.** (Document # 92.)

**BACKGROUND**

The United States of America and the State of Louisiana[1] (collectively, the Government) filed companion suits, Civil Actions 96–872 and 96–862, against defendants Fleming American Investment Trust PLC, Alabama Great Southern Railroad Company (Alabama), Braselman Corporation (Braselman), Shirley Braselman, American Creosote Works, Inc. (American Creosote), Union Camp Corporation, and Kerr–McGee Chemical Corporation pursuant to the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9607 to 9675, to recover the costs of remediating environmental pollution of Bayou Bonfouca. The Government alleges that all of the named defendants and/or their predecessors in interest are owners, operators, former owners, and/or former operators of a facility that used creosote to treat wood, and that during the years the facility was operated by the defendants, creosote was released into Bayou Bonfouca.

The Bayou Bonfouca Superfund Site (Site) is an area comprising approximately 55 acres, which contained an abandoned creosoting works that began operations in 1882, and sections of the adjacent Bayou Bonfouca in Slidell, Louisiana. Braselman, the current owner, purchased the Site on August 15, 1975.

Creosote and other hazardous substances have been released into the environment at and from the Site. The substances, generally known as polyaromatic nuclear hydrocarbons (PAHs), include naphthalene, acenaphthylene, acenaphthene, fluorene, phenanthrene, anthracene, fluoranthene, pyrene, benzo (a) anthracene, chrysene, benzo (b) fluranthene, benzo (k) fluoranthene, benzo (a) pyrene, indeno (1,2,3–cd) pyrene, dibenzo (a, h) anthracene and benzo (g, h, i) perylene. The contamination resulted from drippage from treated wood along rail tracks and in storage locations; discharge of condensate from live steaming and the barometric condenser; discharge of oil-water mixtures from sumps that contained residual solutions from the cylinders; discharge from leaky pipes, pumps, valves, broken pipes, etc.; discharge from sludge that was removed from the work tanks and cylinders and spread on the yard; spills and drip-

---

1. This order does not address the issue of whether the statute of limitations has run as to the State of Louisiana's claims against Alabama under Louisiana law because the motion for summary judgment on the issue whether the State's claims have prescribed was filed after the hearing on these motions.

page of creosote from the loading and unloading of barges and rail cars; and runoff of rain water from the contaminated soil in the yard.

In 1976, the United States Coast Guard conducted an investigation of the Bayou Bonfouca waterway and found creosote in the sediments. The divers conducting the investigation received second degree burns from contact with the sediment.

The Environmental Protection Agency (EPA) placed the Site on the National Priorities List[2] on September 8, 1983. An EPA Remedial Investigation[3] from 1983 to 1986 confirmed the presence of hazardous substance contamination. The EPA selected a remedial alternative in a Record of Decision issued on March 31, 1987, including excavation and incineration of surfacial creosote accumulations and contaminated sediment dredged from the bayou, creek, and drainage channel; the placement of a cap over the residues from the incineration and the surface soils; and treatment of contaminated groundwater. An Explanation of Significant Difference issued on February 5, 1990, because there were indications that the extent of the bayou and groundwater contamination was greater than the original estimate. The Explanation of Significant Difference reaffirmed the remedial action selected in the Record of Decision and increased the estimate of expected remedial construction costs due to the increased contamination found at the Site. The incineration of the contaminants was completed in 1995; however, the groundwater treatment is ongoing. The Government has incurred astronomical response costs at the Site. The cost to the United States has been at least $140,000,000, $13,000,000 of which the State has reimbursed under its 10% statutory share of costs obligation, and the

EPA expects to incur additional costs before the project is completed.

## DISCUSSION

Alabama has filed a motion for summary judgment asserting that the Government is barred by the statute of limitations from recovering response costs expended at the Bayou Bonfouca Superfund Site. Alabama argues that the filing of the action was time-barred because the physical on-site construction commenced in October 1989 or earlier, outside the six-year limitations period applicable to the suit filed on March 11, 1996, following an agreement on December 8, 1995, that if the statute of limitations had not run by that date, the limitation period would be tolled. The Government has filed a cross-motion for summary judgment on the statute-of-limitations issue and the issue of liability for response costs under CERCLA. Alabama has filed a cross-motion for summary judgment asserting that it was neither an owner nor an operator as defined by CERCLA and, alternatively, that it is not jointly and severally liable.

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir.1991); Fed.R.Civ.P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant cannot satisfy his summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of

**2.** The National Priorities List, 40 C.F.R. Pt. 300, App. B, identifies facilities nationwide which threaten the public health, welfare, or the environment through the release of hazardous substances.

**3.** A remedial investigation is a study used to characterize the nature and extent of contamination at a site and to determine remedial alternatives for cleanup.

evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

The material facts are not in dispute. The questions before the court concern the interpretation of CERCLA and the application of the law to the facts.

## I. The statute of limitations

Congress implemented the statute of limitations to express a determination that cost recovery actions must commence in a timely fashion in order to achieve timely cleanup of affected sites and to replenish the fund. *See United States v. Navistar International Transportation Corp.*, 152 F.3d 702, 706 (7th Cir.1998). " 'Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.' " *Badaracco v. Comm'r*, 464 U.S. 386, 391, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) (quoting *E.I. Dupont De Nemours & Co. v. Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924)). CERCLA'S statute of limitations provides in relevant part:

An initial action for the recovery of the costs referred to in section 9607 of this title must be commenced—

(A) for a removal action, within 3 years after the completion of the removal action

. . . .

(B) for a remedial action, within 6 years after the initiation of ***physical on-site construction of the remedial action,*** except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2) (emphasis added). The term "removal" is defined as:

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions, as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). "Remedial" is defined as follows:

The terms "remedy" or "remedial action" mean those actions consistent with permanent remedy taken instead of or in addition to re removal actions in the event of a release of threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment ... [T]he term includes offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24). "Problems of interpretation have arisen from the Act's use of inadequately defined terms, a difficulty particularly apparent in the response cost area." *Artesian Water Co. v. Government*

*of New Castle County,* 851 F.2d 643, 648 (3rd Cir.1988). "[R]emedial actions are generally response actions conducted in accordance with a [Record of Decision] over an extended period of time in amounts exceeding 1 million dollars." *United States v. Akzo Nobel Coatings, Inc.,* 990 F.Supp. 897, 904 (E.D.Mich.1998).

The statute of limitations is triggered for a remedial action when there is an "initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B).

Congress did not establish a bright line rule to establish "the actions that would trigger the limitations period." *See Navistar,* 152 F.3d at 712. Congress specifically stated that "the initiation of physical on-site construction of the remedial action" is the triggering event. *Id.* at 712–13 (placement of clay on the site was a physical action that initiated the construction of a permanent clay cap). A four-part test to determine when "physical on-site construction" occurs was enunciated in *State of California v. Hyampom Lumber Co.,* 903 F.Supp. 1389, 1391–92 (N.D.Cal.1995):

> First, it must be "physical." Second, it must have occurred "on-site." Third, the activity must be part of the "construction of the remedial action." Fourth and finally, in addition to possessing the above characteristics, the activity must constitute the "initiation" of the remedial action.
>
> . . . .
>
> The question of whether a given activity is "construction of the remedial action" calls for a two-part inquiry. First, the activity must be "remedial." Under CERCLA, response actions are characterized as either "removal" or "remedial." . . . [I]t is generally held that "removal actions" are short-term, temporary responses to an immediate threat as well as actions taken to assess, monitor and evaluate a given site, while "remedial actions" are those measures taken to achieve a permanent solution. . . . Second, in addition to being

"remedial," the activity must be part of the "construction of the remedial action." "Construction" is not defined in CERCLA and seems a poor word choice to define the types of physical activities that would go on during a remedial action, inasmuch as the term ordinarily connotes the creation of something that did not exist before, rather than the repair or cleansing of something that already exists. . . . The term still serves the purpose of excluding those preliminary and tentative "physical on-site" activities that while related to the remedial action, are not part of its "construction."

Alabama contends that more than six years prior to entering a tolling agreement on December 8, 1995, the EPA and its contractors undertook activities that qualify as the initiation of physical on-site construction of the remedial action: the installation of monitoring wells and the installation of a groundwater extraction and treatment system. Alabama argues that the construction of the monitoring wells triggered the running of the statute of limitations because the wells were part of the long-term cleanup plan determined by the Record of Decision. As to the installation of the groundwater extraction and treatment system, Alabama argues that the pilot system was initiation of remedial action because it was designed to operate in a similar fashion as the full-scale groundwater remediation system. Alabama asserts that the only difference was that the recovered creosote would be stored during the pilot operations and that it would be incinerated during the full-scale operations. Alabama concedes that the details of the recovery system final design and operation were expected to be developed during the pilot study. As further evidence that construction began in October 1989 or earlier, Alabama relies on two published EPA "Bayou Bonfouca Site Updates" dated June 1990 and December 1, 1990, which stated that "[c]onstruction on the first [operable unit], dealing with

treatment of ground water contamination, began in October 1989 and is still underway."

█ Alabama has not established that "physical on-site construction of the remedial action" was initiated before December 8, 1989 (six years before the tolling agreement). The EPA performed a Remedial Investigation and Feasibility Study between 1983 and 1986. On March 31, 1987, the EPA issued a Record of Decision, which set forth the selected remedy for cleaning up the Site. The EPA performed Remedial Design Investigations in two phases from June 1987 through June 1990 to study *inter alia* the extent of the groundwater contamination at the Site and the sediment contamination in the Bayou. The Remedial Design Investigation included drilling and installing more wells.

Newly constructed and pre-existing monitoring wells were used during the investigation and design phases of the project. However, there is no support for Alabama's proposition that the continued use of these wells during the remedial action phase caused the date of the onset of the remedial action for statute-of-limitations purposes to relate back to the installation of the monitoring wells. Nor does the fact that the monitoring wells were used for a long term trigger the initiation of the remedial action and the running of the limitations period. The distinction between temporary and permanent wells is not relevant to the determination of when the remedial action began.

From February 8, 1989, until March 10, 1989, a Phase II pilot study was conducted. The pilot study did not trigger the initiation of the remedial action. The pilot study was a preliminary activity that was part of the design investigation, not a permanent remedy. The EPA performed a study of two extraction systems and rejected one of them. "Construction" excludes preliminary and tentative activities that

are related to the remedial action. *See Akzo Nobel Coatings, Inc.*, 990 F.Supp. at 906. Accordingly, neither the monitoring of the wells or the pilot study were part of the "construction."

On October 16, 1989, the EPA awarded a contract to conduct the groundwater remediation to Chemical Waste Management, Inc. Chemical Waste Management was required to prepare several written plans for approval before starting on-site construction. A "notice to proceed" with the work was issued on December 12, 1989. Alabama does not identify any physical, on-site action taken by Chemical Waste Management from the October 1989 award of the contract until the December 12, 1989, notice to proceed. The earliest date which "construction" could have begun is the date of the notice to proceed.[4]

The EPA's declarations that "construction" had begun in October 1989 referred to awarding the contract to Chemical Waste Management; however, the mere use of the word "construction" in the updates is not evidence that physical, on-site, remedial action had begun on that date for purposes of the statute of limitations. The action is not time barred because fewer than six years after the notice to proceed, on December 8, 1995, the parties entered the tolling agreement. On March 11, 1996, the Government filed suit against Alabama and others to recover costs to date. As a matter of law, the action is not barred by the six-year statute of limitations.

## II. Liability of Alabama Great Southern Railroad under CERCLA

The Government's motion and Alabama's cross-motion for summary judgment address the question whether Alabama was an "owner" or "operator" of a facility, as defined by CERCLA, during the Creosote Works' earliest period of operation from 1882–1886 and from 1902–1972 when Alabama maintained a system of industrial tracks at the Creosote Works.

---

4. The first physical, on-site activity by Chemical Waste Management that is in evidence is the erection of a fence around the Site on April 2, 1990.

"CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986, facilitates prompt clean up of hazardous sites by establishing a response and financing mechanism to control problems endemic to hazardous waste disposal sites." *United States v. Chromalloy American Corp.*, 158 F.3d 345, 348 (5th Cir.1998). "The statute operates through a bifurcated scheme to promote the cleanup of hazardous substances that have been released into the environment." *Uniroyal Chemical Co., Inc. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir.1998), *modified on reh'g in other part*, 1999 WL 7912 (5th Cir.1999). The Hazardous Substance Response Trust Fund, or Superfund, 42 U.S.C. § 9631, provides money for waste site cleanup, 42 U.S.C. § 9604, or for compensating parties who have incurred response costs. Also, CERCLA gives private parties the right to bring a cost-recovery action against "responsible persons" for costs associated with responding to an environmental threat. 42 U.S.C. § 9607(a).

> To establish a prima facie case for a private cost-recovery action, a plaintiff must prove: (1) that the site in question is a 'facility' under § 9601(9), *see* 42 U.S.C. § 9607(a); (2) that the defendant is a 'responsible person' under § 9607(a), *see* 42 U.S.C. 9607(a); (3) that a release or threatened release of a hazardous substance occurred, *see* 42 U.S.C. § 9607(a)(4); and (4) that the release or threatened release caused the plaintiff to incur response costs, *see* 42 U.S.C. § 9607(a)(4).

*Uniroyal,* 160 F.3d at 242.[5]

Section 9607(a) lists four classes of "responsible persons" that are liable for response costs:

> (1) the [present] owner and operator of ... a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned

or operated any facility at which such hazardous substances were disposed of,

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ..., at any facility ..., and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... or sites selected by such person.

*Id.* at 243; 42 U.S.C. § 9607(a). CERCLA is a strict liability statute, and plaintiffs are not required to prove causation. *Id.* If the plaintiff establishes the elements for a prima facie case, the defendant must prove one of the following defenses listed in § 9607(b): that the release or threat of a release of the hazardous substance that resulted in the damages "were caused solely by—(1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party...." *Id.* & n. 8.

### A. Was Alabama an "owner" or "operator" of a facility in the early years

On July 16, 1881, the Alabama, New Orleans, Texas & Pacific Junctions Railways Co. Ltd. (ANOT & P) obtained a controlling interest in the New Orleans Northeastern Rail Road Company (NONER) and agreed to construct a railway line between New Orleans to Meridian, Mississippi. NONER built and leased the Creosote Works from ANOT & P to treat wood with creosote for railroad ties, pilings, and telephone poles. Alabama is the successor to NONER.

The Government contends that NONER, and thereafter Alabama, was an "owner" of the Creosote Works and the system of industrial tracks that played an integral role at the plant within the meaning of § 107(a)(2) of CERCLA. The Government contends that the Site and the sys-

---

5. The third and fourth elements of the cost-recovery action are not in dispute. Moreover, it is not disputed that the Creosote Works is a

"facility." The question is whether Alabama was an owner or operator of a facility during the relevant time periods.

tem of industrial tracks and railroad cars are facilities where releases or threatened releases of hazardous substances into the environment as defined in § 9601(9) have occurred.

The Government also argues that NONER should be deemed an owner of the Creosote Works from 1882 through 1884 because, as a lessee, it exercised the requisite control over and responsibility for the use of the property. The Government asserts that, in addition to paying rent, NONER exercised its right of possession with respect to third parties that it authorized to use the premises. The November 1, 1981, contract between NONER and Fletcher, Wesenberg & Company (Fletcher) to complete the trestle work across Lake Pontchartrain states that the creosote works contemplated in the contract was moved to Bayou Bonfouca. NONER was obligated to erect creosoting works and grant the use of the works to Fletcher free of charge. Contracts for the construction of the Creosote Works were executed by NONER. Fletcher agreed to return the works to NONER in a complete state of repair at the termination of the contract.

Alabama argues that liability cannot be imputed to NONER because NONER was not an owner. Alabama contends that no lease agreement exists and that a bare reference to the payment of rent is insufficient to impute owner liability. Alabama explains that ANOT & P, as the owner of Creosote Works, charged NONER for the "use of creosote works" only because NONER had a contractual obligation to supply the use of a creosote works to Fletcher, the contractor chosen to construct the trestle.

In *Fletcher v. New Orleans N.E.R. Co.*, 20 F. 345, 346 (E.D.La.1884), Fletcher sued NONER, asserting that NONER improperly exercised its right under the contract to void the contract and take possession of all materials because the work was not completed according to the contract. In that action, Fletcher "conceded that the creosote works and the land upon which they are located belong to the railroad company." *Id.* Although the court stated that NONER could not enforce the forfeiture of Fletcher's property in a suit in equity, the court granted "an injunction to prevent defendant from selling, disposing of, or incumbering property, or removing it from the jurisdiction of this court, until the right to maintain the forfeiture is determined in a suit at law." *Id.*

Alabama argues that the dispute that arose with Fletcher does not impute ownership to NONER. Alabama contends that the reference to ownership by the "railroad company" in the court's opinion in *Fletcher* is inconsequential because it is doubtful that any of the parties would have known which "railroad company" actually owned the Creosote Works.

■ The court concludes that NONER, the predecessor of Alabama, was an "owner" within the meaning of CERCLA during the pre–1900 period. Even though NONER did not have title to the property, NONER was a lessee who asserted control over the property and, as such, was an "owner" for purposes of § 9607(a)(1). *See Burlington Northern v. Woods Indus.*, 815 F.Supp. 1384, 1391 (E.D.Wash.1993).[6] Alabama, as a successor of NONER is liable under CERCLA from 1882–1886.

**B. Was Alabama an "owner" of the system of tracks which was a "facility" from 1902 through 1972?**[7]

The Government argues that Alabama was an owner from 1902 through 1972

---

6. Because NONER was an owner, it is not necessary to determine whether it was also an "operator."

7. There is no merit to Alabama's contention that the question of liability as an owner or

operator of the spur tracks from 1902 until 1972 concerns facts that are beyond the scope of the Government's complaint. The Government placed the defendant on notice of its claims in its complaint and, almost two years ago, in a letter to Carol Browner, the Admin-

because NONER owned the steel rail and associated hardware on spur tracks that serviced the Creosote Works from 1903 until the closure of the facility in 1972, and engaged in the pickup and delivery of freight using the spur tracks. The Government argues that the tracks and adjacent area comprised approximately 20% of the Site, and that the Indentures and Agreements granted NONER possession, control, and responsibility for the system. Further, in 1979, seven years after the plant ceased operations and closed, Alabama entered the property and removed the tracks from the Site. The Government argues that the tracks constitute a structure or installation within the meaning of the term "facility" under § 9607(9).

Alabama contends that the five successive trackage indentures or agreements interpreted under Louisiana law do not indicate ownership because they are similar to easements or rights of way under common law. The defendant cites *Long Beach Unified School Dist. v. Dorothy B. Godwin California Living Trust*, 32 F.3d 1364 (9th Cir.1994) for the proposition that the holder of an easement was not liable under CERCLA as an owner.

Alabama asserts that no civil law court has interpreted such agreements as constituting ownership under CERCLA. Alabama contends that only certain sections of the actual steel rails and hardware associated with those rails were owned by NONER.

> The term "facility" means (A) any building, structure, installation, equipment, pipe, or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited,

stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

*United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 1881 n. 2, 141 L.Ed.2d 43 (1998).

Alabama does not dispute that NONER was the owner of the tracks from during the post 1900 period and that it entered into agreements and indentures giving it the right to place the tracks on the property. NONER was vested with title to various industrial tracks at the Creosote Works under a 1902 conveyance; 1903, 1907, 1910 indentures, a 1925 agreement; and a 1962 agreement. In the 1903 indenture, NONER was responsible for construction, operation, and maintenance of three spur tracks leading from its railway line. In the 1907 indenture, NONER was responsible for construction, operation, and maintenance of five spur tracks. In the 1910 indenture, NONER was responsible for operation and maintenance of the spur tracks leading from the railway line to the Site. In the three indentures, NONER held "the proper use and exclusive possession" of the spur tracks as long as it used the tracks to service the Creosote works. In 1979, seven years after the plan ceased operations, Alabama entered the Site and removed the tracks.

The question whether the agreements were an indicia of ownership of the land is not relevant to the inquiry because the railroad tracks themselves constitute a "facility" within the statutory meaning.

■ The railroad tracks meet the definition of facility because the railroad tracks were an "installation" that played an integral part in the transport and disposal of the hazardous substances. The wood was carried by rail at every stage of the treatment process: from its initial delivery to

---

istrator of the EPA, the defendant's Chief Executive Officer admitted knowledge of the claims regarding the trackage agreements. Further, the defendant provided information regarding the trackage agreements without

objection in discovery and in related insurance litigation, in which the defendant conceded knowledge of the Government's theories from 1902 to 1972.

the Creosote Works through its shipment out of the area as a finished product. The court concludes that Alabama is a responsible person under CERCLA as the owner of a "facility" for the period from 1902 to 1972.[8]

## C. Joint and Several or Divisible Liability

The Government argues that Alabama, as the successor to NONER, should be held jointly and severally liable for the release of hazardous substances at the Site. The Government contends that the harm is indivisible because creosote, consisting of more than 200 individual compounds, was commingled at the Site for nearly a century.

Alabama contends that even if it were liable, joint and several liability is inappropriate because it is prepared to offer evidence to demonstrate that the harm is divisible chronologically, by quantum of production, and by actual response costs related to activities conducted at the site during different periods in history. Alabama contends that all of this evidence is factual and that it is inappropriate for the Government to suggest that undisputed material facts compel a conclusion of joint and several liability.

"[J]oint and several liability is not mandated under CERCLA" and applies only in appropriate cases. *Bell Petroleum Services Inc. v. Sequa Corp.*, 3 F.3d 889, 897, 901 (5th Cir.1993). The Fifth Circuit has adopted the approach that relies almost exclusively on the principles of the Restatement (Second) of Torts. *Id.* at 900. "Under that approach, a defendant who seeks to avoid the imposition of joint and several liability is required to prove the amount of harm it caused." *Id.* An early resolution with respect to the timing of the "divisibility" is preferable; however, the matter is left to the sound discretion of the district court. *Id.* at 901. Equitable fac-

tors are not addressed initially; they are considered in actions for contributions among jointly and severally liable parties. *Id.* "Whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant." *Id.* at 903. "[A]pportionment is appropriate even though the evidence does not establish with certainty the specific amount of harm caused by each defendant[ ]." *Id.*

The opinions offered by Alabama's experts indicate that the releases during the early wood preserving operations, as opposed to subsequent wood preserving operations, can be estimated.

The expert report of Dr. Warren S. Thompson states that the level of contamination during the 1882–1884 operation was very low and that sludge and wastewater volumes represent a small portion of the total production of waste at the Site. The creosote entrained in the wastewater discharge from 1882–1884 was 1,747 pounds compared to approximately 644,910 pounds from 1902–1971. Moreover, loss of creosote was less because the equipment was new and the high cost of creosote was an incentive to minimize losses.

The opinion of Dr. Jurgen H. Exner estimates the composition of creosote oil from London, England during the pre–1990 period; the amount of creosote oil used to treat wood during that period; the amount of creosote oil that was lost to drippage, sludges, spills, and waste; and the decrease in PAH that occurred during the eighteen year period from 1884 until 1903 when the wood-treatment operation was closed.

The report of Ray K. Forrester emphasizes that early wood preserving operations are responsible for a negligible portion of the contamination and remediation. The opinion states that most of the remed-

---

**8.** Because Alabama was an owner of a facility where the release of a hazardous substance occurred, the Court does not address the question whether Alabama was also an operator.

iation expenditures are attributable to the operations in the most recent decades of wood preserving operations at the Site when production and waste generation was higher, the equipment was older, and the cost of creosote was reduced. Further, the report attributes a significant portion of the costs to the catastrophic release of creosote during a fire in 1972.

Thus, Alabama has presented evidence to establish that there are disputed material facts which must be resolved prior to the determination whether there is a reasonable basis for apportioning liability, and summary judgment on this issue is not appropriate.

*Conclusion*

Accordingly, the Government's motion for summary judgment for the recovery of response costs is GRANTED IN PART on the issue of liability as a matter of law. The action is not barred by CERCLA's statute of limitations, and Alabama is responsible for response costs as an owner of a facility where there was a release of a hazardous substance. Alabama's motions for summary judgment on these issues are DENIED. Alabama has demonstrated that there is a genuine issue of material fact on the question of joint and several liability; therefore, the Government's motion for summary judgment is DENIED IN PART on the issue of joint and several liability.