UNITED STATES of America, et al.,

v.

ATLANTIC RICHFIELD, et al.

No. Civ.A. H–98–0408.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 18, 2001.

Linda R. Singer, APR Associates, Washington, DC, pro se.

Richard Gladstein, Robert W. Darnell, Nicholas F. Persampieri, Department of Justice, Environmental Enforcement Section, Washington, DC, for United States.

## ORDER

GILMORE, District Judge.

Pending before the Court are Plaintiffs' cross-motion for partial summary judgment and Defendants' motions for summary judgment. **(Instrument Nos. 332, 300, 302 and 318).** Based on the submissions of the parties and the applicable law, the Court finds that the Plaintiffs' motion should be **GRANTED** and Defendants' motions should be **DENIED.**

### I.

This action commenced as a cost recovery suit by the United States and the State of Texas (collectively, the "Government") under Sections 104 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9604 and 9607, ("CERCLA"), against companies that allegedly released hazardous substances into the environment.[1] The Government seeks recovery of "all response costs, including the costs of removal and remedial action, incurred by the United states and the State of Texas in response to releases and threatened releases of hazardous substances from the Sikes Disposal Pits Site [ ] located in Harris County, Texas." (Instrument No. 1, at 2). The Government also seeks a declaratory judgment that Defendants are liable for any future response costs it incurs.

According to the Government's allegations, the 185–acre site in question was an "unpermitted waste disposal facility" operated by the Sikes family from approximately the mid–1950's to 1968. *Id.* During this time, chemical and oil-based waste from petrochemical plants, refineries, and

1. Defendants include Atlantic Richfield Company, Crown Central Petroleum Corporation, Goodyear Tire & Rubber Company, Occidental Chemical Corporation, Rohm and Haas Company, Shell Oil Company, El Paso Tennessee Pipeline Co., EPEC Corporation, EPEC Polymers, Inc., Tennessee Gas Pipeline Company, Petro–Tex Chemical Corporation, Exxon Corporation, Phillips Petroleum Company, and Vacuum Tanks, Inc.

other industries was deposited at the Site, which is located in Crosby, Texas in the flood plain of the San Jacinto River.

In 1980, the Environmental Protection Agency ("EPA") took samples from the site and detected the presence of organic compounds and heavy metals. Further testing in 1981 and 1982 revealed that the ground water, surface water and soil of the site was contaminated with hazardous materials. In 1982, the State of Texas joined the EPA and together initiated a remedial investigation and feasibility study, which revealed several contaminated areas. The sludge was found to be composed of a variety of substances, including lead, cadmium, chromium, mercury, benzene, trichloroethane, toluene, ethyl benzene, napthalene, and fluorene, among others. Contamination was detected to a depth of thirty feet.

In a September 1986 Record of Decision ("ROD"), the EPA articulated the following remedy:

- Onsite incineration of sludges and contaminated soils;
- Onsite disposal of residue ash—use as backfill;
- Ban use of upper aquifer onsite, while naturally attenuating to $10^{-5}$ Human Health Criteria (less than 30 years);
- Discharge contaminated surface water to river, treat as necessary to meet discharge criteria;
- Monitor lower aquifer and ban its use on site if site degradation occurs. (ROD, Instrument No. 304 Exh. 1 at 003412).

The Government devised plans and specifications for the site over a course of several years. During the planning phase, in March 1988, the EPA erected fencing around certain visibly contaminated portions of the Site. In 1989, the Government accepted bids for the remedial action and awarded the contract to IT–Davy in April 1990. IT–Davy was a joint venture between International Technology Corporation and Davy–McKee Corporation. IT–Davy began working off-site in California and Oklahoma, designing and manufacturing the incinerator to be used at the Site. In July 1990, IT–Davy rented office space in Texas and began organizing the operations of the project, hiring subcontractors and finalizing work plans. The State of Texas signed the contract with IT–Davy on July 27, 1990. IT–Davy began working on-site in August 1990 when it began surveying the site as called for by the remedial action. Also in August 1990, IT–Davy, through a subcontractor, performed mowing, or "bush-hogging," and clearing to prepare the site for surveying. The clearing and surveying were the only activities performed within the fenced-in area at that time. (Instrument No. 308, Gerry Darnell Dep. at 46). The subcontractor leveled and widened a pre-existing dirt road as a temporary access road to the Site and cleared a pad for the construction trailers in mid-September 1990. In late September 1990, three temporary office trailers were set up on the limestone pads outside the fence and a generator and a diesel fuel tank for the trailers were delivered to the Site and installed. Also at this time, air monitoring stations were installed on-site and full-time security commenced.

October 10, 1990 was the effective date of the State of Texas's Notice to Proceed with on-site work. The first shipment of major incinerator components arrived on-site on May 30, 1991. The remedial action was completed on January 6, 1995. The Government, through state and federal agencies, spent more than $125 million cleaning the site.

Plaintiffs and Defendants engaged in alternative dispute resolution beginning in

late 1996 and resulting in mediation in 1998. As part of the process, which was ultimately unsuccessful, the parties agreed that the statute of limitations would be tolled as of October 1, 1996. On February 12, 1998, the Government filed this action seeking reimbursement from Defendants. Defendants subsequently filed third-party actions against twenty other potentially responsible parties for contribution under 42 U.S.C. §§ 9607 and 9613, among other related actions.

In June 2000, Defendants [2] filed motions for summary judgment, arguing that the "initiation of physical on-site construction of the remedial action" at the Sikes Site occurred before October 1, 1990, and that this action is therefore time-barred pursuant to the six-year statute of limitations under 42 U.S.C. § 9613(g)(2)(B). (Instrument Nos. 300, 302 and 318). Defendants argue that on-site construction of the remedial action began either on March 7, 1988, when the EPA began building a fence around the Site, or on September 29, 1990, by which time Plaintiffs' construction contractor had commenced a number of construction activities, including site clearing, and establishing roads, trailers and air monitoring towers.

On July 3, 2000, the Government filed a cross-motion for summary judgment, arguing that no on-site construction of the remedial action took place before October 1, 1990. (Instrument No. 332). This is more properly cast as a motion for partial summary judgment, as it only deals with the issue of limitations. The Government contends that the fence erected in 1988 was part of a removal action and that its other

activities prior to October 1990 were preliminary, pre-construction measures. Even if the events cited by Defendants constitute initiation of construction, the Government concludes, there is a genuine issue of fact as to whether they occurred on-site because they occurred outside the fenced-in area. Defendants did not respond to the Government's argument that the 1988 fencing was part of the removal rather than the remedial action.

In their response dated July 31, 2000, Defendants argue that the Government has improperly limited the term "remedial action" to actions itemized in the ROD. (Instrument No. 371). Defendants contend that the site clearing, surveying, and building erection activities at issue were "consistent with permanent remedy" and fall within the definition of remedial action. With respect to Plaintiffs' contention that some of the activities occurred off-site, Defendants argue that the fence did not change the size of the Sikes Site but only marked the visibly contaminated areas, meaning that just because the activities occurred outside the fence does not mean that they occurred off-site. Plaintiffs and Defendants filed reply and surreply briefs, respectively. (Instrument Nos. 378 and 383).

## II.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A fact is "material" if its resolution in favor of one party might affect the outcome of

**2.** While Occidental Chemical Corp. and Vacuum Tanks, Inc. filed separate motions for summary judgment, these defendants agreed in a hearing conducted August 25, 2000 that their motions were similar in substance to that of "Common Counsel Defendants" (Atlantic Richfield Company, Crown Central Petroleum Corporation, El Paso Tennessee Pipeline Co., EPEC Corp., EPEC Polymers, Inc., Petro–Tex Chemical Corp., Tennessee Gas Pipeline Co., Exxon Corp., Phillips Petroleum Co., Rohm and Haas Co., and Shell Oil Co.). Accordingly, the Court will rely upon Common Counsel Defendants' motion.

the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. Arron*, 954 F.2d 249, 251 (5th Cir.1992). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *See Anderson*, 106 S.Ct. at 2510. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *See id.* at 2511; *Thomas v. Barton Lodge, Ltd.*, 174 F.3d 636, 644 (5th Cir.1999). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process continues." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and for identifying those portions of the record that demonstrate such absence. *See Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir.1999).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);

*Engstrom v. First Nat'l Bank*, 47 F.3d 1459, 1462 (5th Cir.1995). To sustain the burden, the non-moving party must produce evidence admissible at trial. *See Anderson*, 106 S.Ct. at 2514; *see also Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992) (holding that "[t]o avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue").

### III.

The parties agree that the relevant date for the statute of limitations analysis under CERCLA is October 1, 1990. In essence, Defendants contend that setting up the construction trailers and air monitoring towers, clearing the site and improving roads, which took place in September 1990, constitutes initiation of physical on-site construction of the remedial action, triggering the six-year limitations period. The Government argues that these activities were preliminary in nature and did not all take place on-site.

CERCLA is "a broad remedial statute that was designed to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten[ ] the environment and human health." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197 (2d Cir.1992). As a remedial statute, CERCLA should be construed broadly in order to give effect to its purposes. *See B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir.1996). In addition to "facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements", *id*, CERCLA seeks to shift the cost of environmental response from taxpayers to those entities who benefitted from the illegal release of pollutants. *OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1578 (5th Cir.1997).

The starting point for construing a statute is the statutory language itself. *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). CERCLA provides that an action for response costs for a remedial action as here must be brought within six years after "initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). This wording is less than optimal, given that remedial actions are not necessarily constructed, and the statute does not provide a great deal of guidance. The terms "physical," "on-site," and "construction" are not defined in the statute. The regulations implementing CERCLA define construction as "[e]rection, building, alteration, repair, remodeling, improvement, or extension of buildings, structures or other property." 40 C.F.R. § 35.6015(a)(11).

CERCLA defines the phrase "remedial action" to be "those actions consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or to minimize the release of hazardous substances ..." 42 U.S.C. § 9601(24). The statute goes on to give a non-exhaustive list of remedial actions, including "storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment ..."

■ Statutes of limitation are to be construed strictly when applied to bar the Government from pursuing an action. *Ba-*

*daracco v. Commissioner*, 464 U.S. 386, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984). While there is no bright-line rule to define what actions trigger the limitations period, courts have employed a four-part test to determine when "physical on-site construction of the remedial action" takes place. *California v. Hyampom Lumber Co.*, 903 F.Supp. 1389, 1391–1392 (E.D.Cal.1995). The activity must be "physical," in that it cannot consist of planning, meeting or merely observing the site. *See id.* Second, the activity must be "on-site," as opposed to construction that takes place in a factory or other site. *See id.* Third, the actions must be part of the "construction of the remedial action." *Id.* Finally, the activity must be the "initiation" of the remedial action. *Id.* Case law from other district courts indicates that the term "construction" excludes preliminary and tentative physical, on-site activities that are related to the remedial action, but are not part of its construction. *Illinois v. Grigoleit Co.*, 104 F.Supp.2d 967, 975 (E.D.Ill.2000); *Louisiana v. Braselman Corp.*, 78 F.Supp.2d 543, 549 (E.D.La. 1999); *Hyampom Lumber*, 903 F.Supp. at 1392.

■ While Defendants did not respond to the Government's argument about the fencing erected around the contaminated portions of the Site in 1988, the Court will address this matter first. While fencing is clearly physical and on-site, it is not part of the construction of the remedial action and does not constitute initiation of the remedial action. First, "security fencing" is included among items relating to a removal action, rather than a remedial action. *See* 42 U.S.C. § 9601(23). The record reveals that the fencing was put up to keep nearby residents out of a hazardous area, not as part of the remedial action. (Community Relations Plan, Instrument No. 306, Exh. 18 at LAN 015992); *See*

*Hyampom Lumber*, 903 F.Supp. at 1393 (finding security fencing to be part of removal rather than remedial action). Second, there was a lag of over two years between the fencing and even selecting IT–Davy as the contractor, let alone engaging in other on-site construction-related activities. This leads to the conclusion that the fence was at best only tenuously related to construction of the remedial action and, in any case, represented a preliminary and tentative action.

■ Similarly, the perimeter air monitoring platforms are more consistent with a removal action than a remedial action. These platforms were erected for the purpose of obtaining baseline air quality results prior to commencement of on-site construction and to evaluate the health and safety conditions for the area the surveyors would be working. (Plaintiffs' Supplemental Answers to Defendants' First Interrogatories, Instrument 304, Exh. 5 at 2; Instrument No. 308, Thomas Davis Dep. at 65). Actions taken to "monitor, assess and evaluate the release or threat of release of hazardous substances" are considered removal actions under CERCLA. 42 U.S.C. § 9601(23). The platforms were listed under the remedial action. (Instrument No. 308, Carl Edlund Dep. at 136). However, while "monitoring reasonably required to assure that [remedial] actions protect the public health" appears in the definition of remedial actions, this would appear to refer to monitoring undertaken in the course of or after the completion of a remedial action, not prior to on-site construction. *See* 42 U.S.C. § 9601(24). Construction undertaken to permit monitoring or assessing prior to initiation of the remedial

action, therefore, is not construction of the remedial action. Accordingly, the erection of the fence and the air monitoring platforms were preliminary site preparation activities and did not represent initiation of physical on-site construction of the remedial action.

The construction-related activities that took place outside the perimeter fence present more complex issues. Road improvement for temporary access, site-clearing, electricity installation, and placement of construction trailers are clearly physical activities. Plaintiff's protestations to the contrary notwithstanding, these activities took place on-site based on the numerous descriptions of and maps of the Site.[3] The issue is whether these actions constitute initiation of the "construction of the remedial action." Specifically, whether these activities triggered the limitations period revolves around whether these activities, while related to the remedial action, were too preliminary and tentative to be considered an initiation of construction. Defendants stress that these activities were construction by the terms of the remedial action and by the EPA's definition and were "consistent with permanent remedy."

The Seventh Circuit has held that placing a "lift" of clay on-site for construction of a clay cap triggered the limitations period under CERCLA. *United States v. Navistar Int'l Transport. Corp.*, 152 F.3d 702, 713 (7th Cir.1998). The court did not reach the issue of whether connection of utilities, setting up trailers, constructing an access road or clearing the site to prepare for the clay cap was sufficient to

---

**3.** James Feeley, a project manager for the Texas Department of Water Resources at the Sikes Site testified that the National Contingency Plan defined the site as the extent of the release and any proximate areas needed to address the release. (Instrument No. 308 at 70–71). This definition would include the area outside the fence where the trailers were placed and the temporary access road because these areas were used to mobilize the site and address the release by preparing for the remedial action.

trigger the limitations period. *Id.* at n. 19. Construction of the clay cap was specifically listed as the remedy in the remedial action for the site, as well as in the definition of "remedial action" contained in the statute. *Id.* at 711, 713. Because the remedial action called for the construction of a clay cap, the court reasoned, the initiation of that construction began with the delivery of clay to the site. *Id.* at 713.

■ Unlike delivery of the materials for the clay cap in *Navistar*, the remaining activities at issue are tertiary to the selected remedial action here, the incineration and on-site disposal of the hazardous wastes. The site-clearing that took place before October 1, 1990 was for the immediate purpose of surveying the Site, not for construction of the remedial action. (Instrument No. 308, Joe Adams Dep. at 67–71; Gerry Darnell Dep. at 45–46). The purpose of the clearing is underscored by the fact that it consisted largely of brush removal. If the site had been cleared for assembling the incinerator, for example, the activity would be less removed from the goal of the remedial action. However, the purpose behind the site-clearing was to allow for surveying, which is not construction. Surveying preparations cannot constitute initiation of physical on-site construction of the remedial action.

■ The road improvement, the placement of the trailers and the electric generator for the trailers are also too removed from the remedial action to constitute initiation of its construction. While these site preparation actions were physical, constituted construction work consistent with the permanent remedy, and occurred on-site, they were preliminary and were not critical to the incineration and backfill of hazardous wastes. By contrast, the installation of utilities were found to trigger the statute of limitations in *Hyampom Lumber*, in part because they played a "critical role" in the implementation of the permanent remedy, including fire control, dust suppression, steam cleaning, and lighting. 903 F.Supp. at 1393–1394. Here, the trailers would play a lesser, administrative role in the remedial action and the electricity would be for the trailers, not the entire site as in *Hyampom Lumber.* Road improvement for the temporary access road was consistent with construction of the remedy, but such activity is tentative and preliminary and does not represent initiation of physical on-site construction of the remedial action. Installation of utilities comparable to those found to trigger the statute of limitations in *Hyampom Lumber* were not installed until March 1991.

As discussed previously, these activities occurred on-site. However, it is notable that none of them occurred in the fenced-in area where the incinerator was to be constructed and the soil incinerated and disposed of. It is difficult to imagine construction of the remedial action being initiated outside the main contaminated area.

Defendants make much of the fact that the activities at issue were considered to be construction for purposes of the wages paid to workers and were construction under EPA definition.[4] First, it is problematic to import definitions from foreign statutory schemes, even if the EPA and the State of Texas employed these definitions in the remedial action to determine how construction workers were to be compensated. The regulations promulgated pursuant to the Davis–Bacon Act, 40 U.S.C. § 276a, which provides minimum

---

4. While the site preparation activities are labeled "construction" for wage classification purposes, (Instrument No. 307, Exh. 99 at 2), the EPA considered construction to have begun as of the effective date of the notice to proceed, October 10, 1990. (Remedial Action Report, Instrument No. 304, Exh. 6 at 003494).

wage protections under federal contracts, define "construction" as "all types of work done on a particular building or work at the site thereof by laborers and mechanics employed by a construction contractor or construction subcontractors ..." 29 C.F.R. § 5.2(j). The purpose of the statute is to "protect communities and workers from economic disruption caused by outside contractors underbidding local wage levels to obtain federal construction contracts." (EPA Memorandum, Instrument No. 307, Exh. 91 at 3). To this end, unlike the wording in CERCLA's statute of limitations, the Davis–Bacon Act defines "construction" broadly without regard to the aim of the construction. Under this definition, nearly all activity performed by workers would be considered construction, whether it was remedial or removal, critical or peripheral. Taking the word out of context by looking at the EPA's regulation's definition of "construction" of the statute is also of limited utility. For purposes of the statute of limitation, the construction must be the on-site "initiation of the remedial action." Without these modifiers, the term is again too broad, not differentiating between preliminary actions and these activities that are closely tied to the remedy.

Because the fencing, clearing, road improvement and platform and trailer placement were not "initiation of physical on-site construction of the remedial action," the statute of limitations was not triggered before October 1, 1990 and this action is not time-barred. Defendants' motions for summary judgment are **DENIED.** Plaintiff's cross-motion for partial summary judgment is **GRANTED.**

The Clerk shall enter this order and provide a copy to all parties.